IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LAEL SAMONTE, | ) | CIV. NO. 05-00309 HG-KSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | FINDINGS AND RECOMMENDATION |
| vs. | ) | TO DENY PLAINTIFF'S MOTIONS |
| | ) | FOR SUMMARY JUDGMENT, |
| KAY BAUMAN, et al., | ) | PRELIMINARY INJUNCTION, AND |
| | ) | TO AMEND COMPLAINT; AND TO |
| Defendants. | ) | GRANT DEFENDANTS' MOTION FOR |
| _____ | ) | SUMMARY JUDGMENT |

**FINDINGS AND RECOMMENDATION TO DENY PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT, PRELIMINARY INJUNCTION, AND TO AMEND COMPLAINT; AND TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*Pro se* Plaintiff Lael Samonte, has filed motions for summary judgment ("Plaintiff's MSJ"), for preliminary injunction ("Motion for Preliminary Injunction"), and to amend his Complaint ("Motion to Amend Complaint") (collectively "Plaintiff's Motions") in this prisoner civil rights action.[1]

Defendant Kay Bauman, M.D., has filed an Opposition to Plaintiff's Motions and a Cross-motion for Summary Judgment ("Defendant's Cross-Motion"). This proceeding has been designated to this court pursuant to 28 U.S.C. § 636(b)(1)(B) and 636(b)(3) and Rule LR72.4 of the Local Rules of Practice of the United States District Court for the District of Hawaii.

Plaintiff's Motions and Defendant's Cross-Motion were heard

---

[1]Samonte is a Hawaii prisoner currently incarcerated at Florence Correctional Center ("FCC"), located in Florence, Arizona.

on June 6, 2006. James Shin, Esq., appeared on behalf of Defendant Bauman and Plaintiff appeared telephonically.[2] This court FINDS and RECOMMENDS that Plaintiff's MSJ, Motion for Preliminary Injunction, and Motion to Amend Complaint be DENIED and that Defendant's Cross-Motion be GRANTED.

## BACKGROUND

As the allegations in this action have been fully set forth in this court's January 5, 2006 findings and recommendation, the court will only summarize the pertinent, uncontested facts here. (*See* Docket No. 43, Findings and Recommendation to Grant in Part and Deny in Part Motion to Dismiss.)

Samonte alleges that Bauman and other prison officials denied and delayed medical care to him for certain eye conditions that he has experienced since 2002, in violation of the Eighth Amendment. On February 25, 2002, Samonte filed a prison grievance complaining that he had submitted a medical request to be scheduled for an appointment on February 4, 2002, and had not yet been seen. (*See* Pl.'s Step 1 Griev. No. 79840.) In this grievance, Samonte complained that he had blurred vision and

---

[2]At the hearing, Samonte again raised the issue of his "right" to be physically present at the hearing, and objected to the telephonic proceedings. The Court has already addressed this issue twice by written order. *See* Docket No. 48, <u>Order Denying Motion for Physical Access to the Court</u>, and Docket No. 57, <u>Order Denying Second Motion for Physical Access to the Court</u>. Consequently, the Court orally denied Samonte's renewed objection at the hearing.

discharge from his eyes.  Samonte was seen by the prison doctor, Dr. Paderes, on March 12, 2002, and then by the prison optometrist, Dr. Kubo, on March 21, 2002.  (*See id.* & Step 2 Griev. No. 84705; Def.'s Ex. 1.)  He was seen at the prison medical unit again for a follow-up visit on July 15, 2002.  (*See* Pl.'s Step 1 Griev. No. 84705.)  In response to Grievance No. 84705, Samonte was told that Dr. Bauman, the newly-appointed prison medical director, was arranging for a new prison optometrist and asked to be patient.  (*Id.*)

On October 25, 2002, Samonte was seen by Dr. Ralph Nakamoto, O.D., an outside optometrist who provided services at the prison on a monthly basis.  (Bauman Aff. ¶¶ 6-7; Def.'s Ex. 1.)  Dr. Nakamoto found that Samonte had a 2.2 mm pterygium in his right eye and a cortical cataract in his left eye.  (*Id.*)  Dr. Nakamoto recommended daily use of bifocals and an annual follow-up.  (*Id.*)  Samonte's visual acuity was 20/50 in both eyes at this visit.  (Def.'s Ex. 1.)

Eight months later, on June 30, 2003, Samonte reported to sick call complaining that his right-eye pterygium was bothering him.  (Def.'s Ex. 2, Docket No. 77-5 at 5.)  He was scheduled to see a physician, and on September 23, 2003, he was seen by Dr. Abbruzzesse at the prison clinic.  (*Id.* at 4.)  Dr. Abbruzzesse noted the pterygium, and indicated it should be watched.  (*Id.*)

Seven months later, on April 13, 2004, Samonte submitted a

3

Step 1 Grievance, Number 105697, stating that his eye was irritated, he had a "white growth" on his eye, and possibly a cataract. (Griev. No. 105697.) Samonte complained that a "one year delay is too excessive and a form of denial to medical treatment." (*Id.*) Samonte was informed that at his last visit with Dr. Nakamoto, on October 25, 2002, it was recommended that he only be seen yearly, and that he was being scheduled for a follow-up. (*Id.*) On April 30, 2004, Samonte appealed this grievance, and was told that he would be seen by a doctor soon. (Step 2 Griev. No. 105985.)

On May 7, 2004, Dr. Paderes requested a consultation with an outside optometrist to evaluate the Samonte pterygium. (Def.'s Ex. 2 at 22.) Samonte was seen on June 2, 2004, by Dr. Nakamoto. (*Id.*) Nakamoto assessed presbyopia, the right-eye pterygium, and a cortical cataract in Samonte's left eye. (*Id.*) Dr. Nakamoto recommended bifocal use. (*Id.*) Dr. Nakamoto's notes state that Samonte refused his recommendation for bifocals. (*Id.*) At the hearing, however, Samonte disputed this, stating that he did not refuse bifocals, but rather, informed Dr. Nakamoto that he did not have sufficient funds to purchase bifocals. Samonte's visual acuity at this visit was 20/40 in his right eye and 20/70 in his left eye. (*Id.*)

On July 6, 2004, Dr. Paderes requested further consultation for evaluation of the pterygium and cataract. (*Id.* at 17.)

Samonte was seen by Dr. M. Pierre Pang, at the Pacific Eye Surgery Center on July 21, 2004.  (*Id.* at 18-20.)  Dr. Pang noted a 2.2 mm pterygium in Samonte's right eye, cataracts in both eyes, and that Samonte's visual acuity was 20/50 in both eyes.  (*Id.*)  Dr. Pang discussed surgical and non-surgical treatments with Samonte, who preferred surgery for both his pterygium and his cataracts.  (*Id.* at 19.)  Dr. Pang recommended surgical removal of the pterygium.  (*Id.*)

Drs. Bauman and Abruzzesse met on July 23, 2004, to review Dr. Pang's report.  (Bauman Aff. ¶ 12.)  At that time, no decision was reached regarding approval for either surgery.  (*Id.*)  On September 8, 2004, Drs. Bauman and Abruzzesse met again and approved the pterygium surgery due to its progressive nature.  (*Id.* ¶ 13; Def.'s Ex. 2 at 15.)  They denied Samonte's cataract surgery, however, based on his age, his corrected visual acuity of 20/50, and their understanding that "cataract surgery was not performed within the medical community until the best corrected vision was poor."  (*Id.*)  They resolved to continue monitoring Samonte's cataracts with treatment as appropriate.  (*Id.*)

On September 29, 2004, Samonte was examined by Dr. Soriano at the Pacific Eye Surgery Center.  (Def.'s Ex. 2 at 16.)  His visual acuity remained 20/50 in both eyes.  (*Id.*)  On October 21, 2004, Dr. Soriano again examined Samonte's eyes in preparation for the pterygium surgery and found that his visual acuity was

5

20/50 in the right eye and 20/40 in the left eye. (*Id.* at 14.)

On December 9, 2004, Dr. Pang excised the pterygium "with conjunctival graft and lamellar keratectomy of the right eye." (Bauman Aff. ¶ 15; Def.'s Ex. 2 at 12.) Thereafter, Drs. Pang or Soriano saw Samonte on December 17, 2004, January 3, January 21, and March 21, 2005, for post-surgery follow up appointments. (Def.'s Ex. 2 at 6, 7,8, 9, 10.)

On February 14, 2005, Dr. Nakamoto examined Samonte, and determined that his visual acuity was 20/40 in the right eye and 20/60 in the left eye. (*Id.* at 8.) Dr. Nakamoto found that Samonte's cataract was "not [at] surgical stage[,]" and informed Samonte that his photosensitivity was "due to his habit of screening his window in the 'hole.' He has to remove any object blocking his windows." (*Id.*)

On March 21, 2005, Dr. Soriano saw Samonte again for his complaints of photosensitivity, itching, and burning. (Def.'s Ex. 2 at 6-7.) At that time his visual acuity tested at 20/25 in his right eye and 20/40 in his left eye. Dr. Soriano prescribed eye drops and artificial tears and informed Samonte that "eyewear" would relieve his symptoms.

On March 28, 2005, Samonte was transferred to FCC. On March 30, 2005, he requested an eye examination, stating that his last refraction was more than two years earlier. (Def.'s Ex. 3 at 9.) This request was denied, as Dr. Soriano had performed a

6

refractive examination on March 21, 2005.  (*Id.*)  At the hearing, Samonte informed the court that he has now received cataract surgery in Arizona in April 2006.

## LEGAL STANDARD

Summary judgment shall be granted when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  *See id.* at 323.  A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  The moving party must identify for the court "those portions of the materials on file that it believes

7

demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." *Porter*, 419 F.3d at 891 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *California v. Campbell*, 319 F.3d 1161, 1166 (9th Cir. 2003); *Addisu*, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv.*, 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. *Porter*, 419 F.3d at 891. The

8

court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. *Id.* However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 631.

## DISCUSSION

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

I.  Plaintiff's MSJ Should be Denied and Defendant's Motion Should be Granted.

The Government violates the Eighth Amendment if it fails to address the medical needs of incarcerated individuals. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (*en banc*). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 102.[3] This is true when the

---

[3] For purposes of the Eighth Amendment, serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of

indifference is manifested by prison doctors in their response to a prisoner's needs.  *Id.* at 104-05.  However,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Id.* at 105-06; accord *Lopez*, 203 F.3d at 1131.

   A difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs.  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  To establish that a difference of opinion amounted to deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health."  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *see also Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992) (stating that prisoner may demonstrate deliberate indifference if prison officials relied on

---

chronic and substantial pain."  *Lopez*, 203 F.3d at 1131.

10

the contrary opinion of a non-treating physician).

In deciding whether there has been deliberate indifference to Samonte's serious medical needs, this Court is not required to defer to the judgment of prison doctors or administrators. *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1988); *Nelson v. Locke*, 2005 WL 1030207, *6 (E.D. Wash. May 2, 2005).  However, the Ninth Circuit has recognized that a "difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. State of Or., State Welfare Division*, 662 F.2d 1337, 1344 (9th Cir. 1981).  Similarly, "a prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution."  *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986).

The uncontested facts before this court show that Samonte first complained of eye irritation in February 2002, was seen March 12, 2002, by the prison physician, Dr. Paderes, and then seen by the prison's visiting optometrist on March 21, 2002. Samonte had a follow-up exam in July 2002, and another on October 25, 2002.  At that exam, Dr. Nakamoto diagnosed the pterygium and possible cataract, and recommended *yearly* follow-ups to monitor the progression of these conditions.  Dr. Nakamoto did not suggest or recommend surgery.

Samonte was seen eight months later at sick call, and again three months later by Dr. Abbruzzesse. Dr. Abruzzesse examined and noted the pterygium, and recommended that the medical unit "continue to follow." (Def.'s Ex 2 at 3.)

Seven months later, on April 13, 2004, Samonte again complained of eye irritation and was informed that he was being scheduled for a medical appointment. Samonte was seen by Dr. Paderes three weeks later, and one month after that by Dr. Nakamoto. Dr. Paderes then scheduled Samonte for a consultation at the Pacific Eye Surgery Center, where he was seen on July 21, 2004. Dr. Pang examined Samonte's eyes, and informed him of his options, which included surgery for his cataracts and pterygium. Dr. Pang did not, however, recommend surgery as the only course for the cataracts, although this is the treatment that Samonte preferred.

Dr. Bauman and Dr. Abruzzesse reviewed Samonte's medical records and approved excision of the pterygium. Neither Dr. Pang nor Dr. Soriano ever stated that Samonte *required* cataract surgery at that time. Dr. Bauman and Dr. Abruzzesse decided that, due to many factors, Samonte's cataracts were not yet ready to be surgically excised, despite Samonte's desire for such surgery.

These uncontroverted facts do not support a finding of deliberate indifference by Dr. Bauman or any other prison

12

official.  Samonte was treated and monitored many times by many physicians both within and outside of the prison.  There is no indication in the record that there was ever a dispute between these physicians over the proper course of treatment.  The only dispute shown in the record is that Samonte decided early on that he wanted surgery for his cataracts, although he was told they could be treated by using bi-focal eyeglasses until such time as his vision deteriorated to an unacceptable level.  The record is clear that Samonte's visual acuity had not deteriorated to such a level.  Samonte's desire for this surgery, and Dr. Bauman's denial of it at that time, does not amount to a constitutional violation.  *See Franklin*, 662 F.2d at 1344.

Even if there were a difference of opinion between Dr. Bauman and the Pacific Eye Surgery Center physicians, which it is clear there was not, Samonte does not establish that the course of treatment Dr. Bauman chose, to monitor his cataract condition and to wait to perform surgery until his vision had deteriorated, was medically unacceptable under the circumstances or that she chose this course "in conscious disregard of an excessive risk to [Samonte's] health." *Jackson*, 90 F.3d at 332.  Samonte fails to provide any competent evidence controverting this fact.  The fact that Dr. Bauman ultimately decided that Samonte should have the cataract surgery in April 2006, does not undercut this conclusion, but in fact, supports a finding that prison officials

13

continued to monitor Samonte's eye condition and continued to provide medical care as necessary.  This Court FINDS that neither Dr. Bauman nor any other prison official was deliberately indifferent to Samonte's serious medical needs and RECOMMENDS that Samonte's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED.

II.  <u>Defendants Are Entitled to Qualified Immunity.</u>

Dr. Bauman also asserts, in the alternative, that she is entitled to qualified immunity.  This Court agrees.

*Saucier v. Katz*, 533 U.S. 194 (2001), sets forth a two-step inquiry for determining whether qualified immunity applies. First, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged [must] show [that] the officer's conduct violated a constitutional right."  *Id.* at 201.  This prong of the *Saucier* inquiry "mirrors the substantive summary judgment decision on the merits."  *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).  "If no constitutional right would have been violated were the allegations established," the inquiry ends.  *Saucier*, 533 U.S. at 201.  If there appears to have been a constitutional violation, however, the second step is to determine whether the right in question was "clearly established . . . in light of the specific context of the case, not as a broad general proposition."  *Id.; Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004).

As detailed above, the facts alleged do not show that the Dr. Bauman, or any other prison official, violated Samonte's constitutional right to be free from cruel and unusual punishment by failing to provide timely and adequate medical treatment. *See Saucier*, 533 U.S. at 201. Thus, Dr. Bauman is entitled to qualified immunity for Samonte's claims against her.

III. Samonte's Motions for Preliminary Injunction and to Amend the Complaint Should Be Denied.

Samonte moves for a preliminary injunction requiring Defendants to transfer him back to Hawaii and to allow Drs. Pang and Soriano to perform the cataract surgery he desires.

    A.    The Motion for Preliminary Injunction Should be Denied.

First, Samonte has now received the cataract surgery he sought through this Motion, rendering his request moot.

Second, to obtain a preliminary injunction a party must demonstrate: (1) probable success on the merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief. *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993). Should a moving party fail to demonstrate any chance of success on the merits, a court may disregard the determination of potential injury or a balancing of hardships and deny the injunction. *Arcamuzi v. Continental Air*

*Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987); *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982). As detailed above, Samonte fails to demonstrate any chance of success on the merits of his underlying action. This Court FINDS AND RECOMMENDS that his Motion for Preliminary Injunction should be DENIED.

    B.   <u>Amendment to the Complaint is Futile.</u>

Rule 15 of the Federal Rules of Civil Procedure provides that a party may amend its pleadings "by leave of court" and that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A motion to amend may be denied however, where amendment to the complaint is futile. *United States v. Pend Oreille Public Utility Dist. No. 1*, 926 F.2d 1502, 1511 (9th Cir. 1991) (discussing four factors to consider on a motion to amend). Having found that Defendant's Motion for Summary Judgment should be granted, this court FINDS that amendment to the complaint is futile and Recommends that the Motion to Amend the Complaint be DENIED.

### CONCLUSION

The court FINDS and RECOMMENDS that the Plaintiff's Motion for Summary Judgment be DENIED, his Motion for Preliminary Injunction be DENIED, and his Motion to Amend Complaint be DENIED. The court further FINDS and RECOMMENDS that Defendant Dr. Kay Bauman's Cross-motion for Summary Judgment be GRANTED.

IT IS SO FOUND AND RECOMMENDED.

DATED:   Honolulu, Hawaii, June 7, 2006.



_____
Kevin S.C. Chang
United States Magistrate Judge

SAMONTE v. BAUMAN, et al., CV 05-00309 HG/KSC; FINDINGS AND RECOMMENDATION TO DENY PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT, PRELIMINARY INJUNCTION, AND TO AMEND COMPLAINT; AND TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; dmp\\ F&R 06\\Samonte 05-309 (2 MSJ & P.INJ)